IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RODNEY GREGORY, on behalf of himself and all others similarly situated, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | No. 15-2601 |
| v. | : | |
| | : | |
| METRO AUTO SALES, INC. d/b/a VALUE KIA, | : | |
| | : | |
| Defendant. | : | |

MCHUGH, J.                                                                                                  JANUARY 27, 2016

### MEMORANDUM

This is a putative class action in which Plaintiff accuses an auto dealer of deceptive trade practices related to Plaintiff's purchase of an automobile. Plaintiff claims that Metro Auto secretly inflated the price of the vehicle he purchased in order to offset the generous credit it offered for trade-ins as part of a sales promotion. Plaintiff also claims that Defendants failed to disclose frame damage to the vehicle. He asserts that Metro violated the Truth In Lending Act (TILA) and the Unfair Trade Practices and Consumer Protection Law (UTPCPL), and Metro now moves to dismiss.

I.   Facts

As alleged in the First Amended Complaint (hereinafter the "Complaint"), in 2014 Defendant was advertising a program it called "Cash for Clunkers." Through the program Defendant promised to provide "at least $4,500 for any trade accepted towards a vehicle purchase" from Defendant. Compl. at ¶ 8. In June of 2014, Plaintiff, Rodney Gregory, visited Defendant's location to take advantage of the program by trading in his 1995 Jeep Cherokee for a 2012 Ford Escape. *Id.* at ¶ 9. Plaintiff completed the transaction by signing a Retail

1

Installment Contract (RISC) that set the terms of the trade and sale.  The cash sale price of the Ford Escape was $29,214; the down payment was $1000, and Defendant valued the trade-in vehicle at $4,500.  *Id.* at ¶ 12.

Plaintiff now brings two claims against Defendant.  First, he alleges that Defendant inflated the cash price of the Ford Escape and the trade-in price of the Jeep Cherokee in order to make the RISC more attractive to a third party purchaser.  Essentially, Plaintiff claims that his trade-in vehicle was worth far less than the trade-in value Defendant gave for it, and that Defendant inflated the cash price of the Ford Escort to compensate for the difference.  This strategy would have the effects of (1) making it appear that Defendant was being far more generous with its trade-in than it was, and (2) improving the loan-to-collateral ratio of the RISC.  Plaintiff alleges this practice violated the TILA.

Second, Plaintiff alleges that the Ford Escape had frame damage that Defendant failed to disclose.  The failure to disclose the car's history, Plaintiff contends, violated Pennsylvania's UTPCPL.

Plaintiff has cast his Complaint as a class action on behalf of all those wronged by Defendant's practices.  Defendant has moved to dismiss the Complaint in its entirety.  Defendant contends that the dispute is governed by an arbitration agreement, and that the TILA, UTPCPL, and class claims are insufficiently pleaded.

II.   Legal Standard

Defendant has moved to dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  *Fowler* describes a two-part test for 12(b)(6) motions to dismiss in this circuit.  First, the court must separate the factual and legal elements of the claim.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  Second, accepting the Complaint's factual

allegations as true, the court must decide whether the plaintiffs have alleged facts that show they are entitled to relief. *Id.* If Plaintiff has failed to allege facts that show he is entitled to relief, Defendant's Motion must be granted.

III.     Applicability of the Arbitration Agreement

Preliminarily, Metro contends that all of Plaintiff's claims must be submitted to binding arbitration. A document Defendant identifies as the contract between the parties included a checkbox with a caption stating, "BUYER ACKNOWLEDGES THAT IF THIS BOX IS CHECKED, THIS AGREEMENT CONTAINS AN ARBITRATION CLAUSE." Memo Supporting Mot. to Dismiss at 6. Plaintiff's signature appears just below the checked box, and the text of the arbitration clause is on the next page of the document. This clause, Defendant avers, binds Plaintiff to arbitrate his claims. Plaintiff counters that the arbitration agreement is not binding because it is contained only in a "buyer's order" rather than the RISC, and for that reason cannot under Pennsylvania law constitute a binding arbitration agreement.

Plaintiff is correct. The Federal Arbitration Act ("FAA") provides that *valid* arbitration agreements shall be enforceable and entitle a party to a valid agreement to an order compelling the arbitration. 9 U.S.C. § 4. However, the existence of an arbitration agreement depends on state law. "To determine whether the parties have agreed to arbitrate, we apply ordinary state-law principles that govern the formation of contracts." *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 524 (3d Cir. 2009); *Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005) ("The FAA instructs courts to refer to principles of applicable state law when determining the existence and scope of an agreement to arbitrate."). In Pennsylvania, as a matter of statute, a "RISC subsumes all other agreements relating to the sale" of a vehicle under the Motor Vehicle Sales Finance Act. *Knight v. Springfield Hyundai*,

3

81 A.3d 940, 948 (Pa. Super. Ct. 2013) (construing 12 Pa. Con. Stat. Ann. & 6221(a)(2)).  In *Knight*, Pennsylvania's Superior Court held that where a "Buyer's Order contained an arbitration agreement, but the RISC did not. … there was no enforceable arbitration agreement."  *Id.* at 948–49.  Likewise, here the RISC does not contain the arbitration agreement Defendant seeks to enforce.  In its analysis of this issue, Metro simply ignores *Knight*.  I conclude that there is not a valid arbitration agreement binding the Plaintiff under Pennsylvania law.

    IV.    Truth in Lending Act

Count I of Plaintiff's Complaint alleges Defendant violated the Truth in Lending Act ("TILA").  Congress adopted the TILA and authorized the Bureau of Consumer Financial Protection to promulgate regulations to implement it "to promote the informed use of consumer credit by requiring disclosures about its terms and cost."  12 C.F.R. § 1026.1.  Regulation Z, which implements the TILA, requires companies that provide credit to disclose any "finance charge" for the credit.  12 C.F.R. § 1026.18.  A "finance charge" is "the dollar amount the credit will cost" a consumer.  *Id.*

Plaintiff contends that the $4,500 Defendant reported on the RISC was "fictitious" and was actually "an additional charge to plaintiff to secure financing."  Compl. at ¶ 43.  Plaintiff believes this amount was a "finance charge" that should have been disclosed as such to Plaintiff.  By failing to identify it as such, Plaintiff asserts that Defendant violated the TILA and that Defendant is therefore liable to Plaintiff under the TILA's private remedy.  15 U.S.C. § 1640(a) (providing civil liability for failure to comply with TILA requirements).  I cannot accept Plaintiff's categorization of the $4,500 trade-in amount as a "finance charge."  It is reasonable, from one perspective, to view the $4,500 trade-in value as some variety of charge imposed on Plaintiff.  If the true value of Plaintiff's trade-in vehicle was far less than $4,500, and Defendant

4

increased the cash price of Plaintiff's new car to compensate for overpaying Plaintiff for his trade-in, then the amount by which Defendant inflated the cash price of the new car can fairly be deemed a charge.

But not every charge is a *finance* charge. Regulation Z, promulgated by the Federal Reserve Board, is considered an authoritative interpretation of TILA. The Board-published official staff commentary to Regulation Z is dispositive in TILA cases unless the commentary is demonstrably irrational. *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 565–68 (1980). Regulation Z specifically exempts from the definition of "finance charges" "any charge of a type payable in a comparable cash transaction." Here, the charge that compensated for over-valuing the trade-in vehicle would have been, under the facts Plaintiff has alleged, equally applicable to consumers paying cash for a new vehicle. Plaintiff argues that "the $4,500 Cash for Clunkers program's purpose is to secure credit for cash poor borrowers with fictitious trade-in equity" and therefore "such a program would play no role in a cash transaction." Pl. Opp. to Mot. to Dismiss at 6. This argument fails because the availability of the $4,500 trade-in was not contingent on a consumer's use of credit. Compl. at ¶ 8–9. A sum that a consumer must pay whether a consumer is paying in cash or with credit is not a "finance charge."

Other courts facing similar claims have reached the same result. *Slover-Becker v. Pitre Chrysler Plymouth Jeep of Scottsdale, Inc.*, 409 F. Supp. 2d 1158, 1165 (D. Ariz. 2005) ("The cash price was clearly inflated; however, … the Staff Interpretation permits a creditor to include charges that are equally imposed on cash and credit transactions to be included in the cash price."); *Bledso Dodge, L.L.C. v. Kuberski*, 279 S.W.3d 839, 843–44 (Tex. App. 2009) ("The $6,100 was not a charge incurred because Kuberski was a credit customer … . It was not an

amount payable by him and imposed by the creditor as an incident or condition of the extension of credit.").

In reaching this result, I have reviewed the staff Commentary to Regulation Z in the separate but conceptually analogous context of "negative equity," where a pre-existing lien on a vehicle being traded in exceeds its fair market value. In explaining the obligation of dealers in such circumstances, where the overall price is being artificially adjusted upward, Federal Reserve staff issued the following revised comment:

> Content of Disclosures, 18(c) Itemization of Amount Financed
>
> Comment 18(c)–2 is revised in response to requests for guidance by creditors offering credit sales when downpayments involve a trade-in and an existing lien that exceeds the value of the trade-in. (See comment 2(a)(18)–3, where a consumer owes $10,000 on an existing automobile loan and the trade-in value of the automobile is $8,000, leaving a $2,000 deficit.)
>
> The amount by which *the lien exceeds the trade-in value* would be reflected in the amount financed. (See § 226.18(b).) Assuming the *cash price* for the new car was $20,000, the amount financed would be $22,000 ($20,000 representing the cash price plus $2,000 representing *the excess of the lien over the trade-in value* financed by the creditor.)
>
> The regulation provides great flexibility for disclosing the itemization of amount financed. Comment 18(c)–2 iii ... is revised to clarify that any amounts financed by the creditor and representing the excess of the lien over the trade-in value ($2,000 in this example) must appear in the itemization of the amount financed. However, creditors may also add other categories to explain, in this example, the consumer's trade-in value of $8,000, the creditor's payoff of the existing lien of $10,000, and the resulting amount of $2,000 included in the amount financed.

Truth in Lending, 63 Fed.Reg. 16,669, 16,673 (April 6, 1998) (emphasis added), *cited by Fitts v. King Richard's Auto Ctr., Inc.*, No. C.A. 07-147ML, 2009 WL 256379, at *3 (D.R.I. Feb. 3, 2009).

That approach comports with Defendant's action here. The focus of the TILA is full **disclosure** of all terms and charges. The value of the trade-in, and (by Plaintiff's theory)

6

resulting inflation of the sale price, were fully set forth in the RISC.  Regardless of whether Plaintiff was unfairly taken advantage of in the overall transaction, I do not see a violation of the TILA.  *See Fitts*, 2009 WL 256379, at *3.  All of the financial terms of the transaction were set forth in full.  Plaintiff's TILA claim will be dismissed.

    V.      UTPCPL

Plaintiff's Count II alleges Defendant violated Pennsylvania's Unfair Trade Practices and Consumer Protection Law (UTPCPL).  The UTPCPL prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  73 P.S. § 201-3.  The law enumerates and defines "unfair or deceptive acts or practices" in section 201-2.  Plaintiff alleges Defendant engaged in conduct that violated multiple provisions of the UTPCPL.  Plaintiff first claims that by concealing the vehicle's use and accident history (and the resultant decrease in the vehicle's value), Defendant violated the prohibition against "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or qualities that they do not have …"  73 P.S. § 201-2(4)(v).  Plaintiff alleges Defendant also violated this paragraph by failing to make disclosures about the car's status that are explicitly required by regulation.  The controlling regulation declares it is "considered unfair methods of competition and unfair or deceptive acts or practices" for a motor vehicle dealer to misrepresent certain qualities of a vehicle.  37 Pa. Code § 301.2.  The regulation specifically requires dealers to disclose prior to sale certain conditions that exist in a vehicle, such as a frame that is "bent, cracked or twisted."  *Id.* at § 301.2(5)(i).  Plaintiff contends that Defendant violated the UTPCPL by failing to make this required disclosure.  In addition, Plaintiff argues that by concealing the vehicle's history, Defendant violated the "catchall" provision of the UTPCPL, which provides that it is unlawful to

"[e]ngag[e] in any other fraudulent conduct which creates a likelihood of confusion or misunderstanding."  73 P.S. § 201-2(4)(xxi).

Count II of the Complaint, raising the UTPCPL claims, specifically incorporates all of the earlier allegations in the complaint, and I construe it as alleging that Defendant's conduct relating to the trade-in value and alleged price inflation also violated the UTPCPL.  *See* Compl. at ¶ 54(b)–(d).  Defendant has not moved to dismiss on that ground.  Focusing on Plaintiff's allegations it failed to disclose frame damage, it moves to dismiss for two reasons.  First, Metro argues that it does not have a duty to disclose all types of frame damage to its customers.  The regulation only requires disclosure when a frame is "bent, cracked or twisted," with the result that Plaintiff's allegation of unspecified "damage" is too vague as it may encompass types of damage that might not be covered.  Second, Defendant argues that a plaintiff making a UTPCPL claim must allege that he justifiably relied on a defendant's representations, which Plaintiff does not.

Although Defendant makes a number of somewhat persuasive arguments, I find that Plaintiff has stated a claim under the UTPCPL.  I agree with Defendant that Plaintiff's assertion of "damage" is a broader term than the phrase "bent, cracked or twisted" that appears at 37 Pa. Code 301.2(5)(i), and further agree that the regulation does not, on its face, require the disclosure of all types of "damage" to a frame.  The regulation employs the present tense to describe conditions that "exist in the motor vehicle," so frame damage that has been repaired and no longer exists would arguably not be covered by the regulation.

That does not end the analysis.  The UTPCPL is a flexible statute that prohibits fraudulent or deceptive conduct beyond the failure to comply with this specific disclosure rule.  Pennsylvania's "Supreme Court has stated courts should liberally construe the UTPCPL in order

8

to effect the legislative goal of consumer protection." *Bennett v. A.T. Masterpiece Homes at Broadsprings, LLC*, 40 A.3d 145, 151 (Pa Super. Ct. 2012).  The significance of damage to a vehicle frame presents issues of fact, in that such damage can indicate that a vehicle was previously involved in some form of meaningful impact.  I cannot broadly hold as a matter of law that vehicle damage supposedly repaired need not be disclosed.  Plaintiff has alleged Defendant violated multiple provisions of the UTPCPL, including the "catchall" provision that prohibits "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 Pa. Stat. § 201-2(4)(xxi).  I am satisfied that Plaintiff has alleged facts that would permit a jury to decide Defendant engaged in unfair or deceptive practices prohibited by the UTPCPL.

Moreover, although I agree that Plaintiff cannot presume reliance, because I remain bound by *Hunt v. United States*, 538 F.3d 217, 224 (3d Cir. 2008),[1] I find that actual reliance has been adequately pleaded.  Specifically, Plaintiff avers that Metro intentionally omitted material facts about the vehicle he hoped to buy, and that such omissions caused him to proceed with the purchase.  Complaint ¶ 48–50.  This is enough to survive the present motion.  "[J]ustifiable reliance is typically a question of fact for the fact-finder to decide, and requires a consideration of the parties, their relationship, and the circumstances surrounding their transaction." *Toy v. Metro. Life Ins. Co.*, 593 Pa. 20, 55, 928 A.2d 186, 208 (2007).

---

[1] *See Panetta v. Milford Chrysler Sales Inc.*, 2015 WL 1296736 (E.D. Pa. March. 23, 2015) (noting that while the Pennsylvania Superior Court has found the catchall provision of the UTPCPL may be proven without reliance, the state Supreme Court has not ruled and Third Circuit law remains controlling on district courts).  *See also Belmont MB Inv. Partners, Inc.*, 708 F.3d 470, 499 (3d Cir. 2013).

9

VI. Class Claims

Finally, Defendant challenges Plaintiff's class claims. Defendant argues that Plaintiff has not adequately pleaded commonality, typicality, and Plaintiff's adequacy to represent the class. As a the Third Circuit explained in *Landsman & Funk PC v. Skinder-Strauss Assocs* "in most cases, some level of discovery is essential" to determine whether a complaint may proceed as a class action. 640 F.3d 72, 93 (3d Cir. 2011). Making that determination requires a "rigorous analysis" that requires the court "to venture into the territory of a claim's merits and evaluate the nature of the evidence." *Id.; see also Vlachos v. Choice One Cmty. Fed. Credit Union*, No. 11-57, 2011 U.S. Dist. Lexis 84403 at *9 (M.D. Pa. May 16, 2011) ("in general determination of class certification on a motion to dismiss is premature"). I cannot make this complex decision on the bare allegations now before me.

VII. Conclusion

For these reasons, Defendant's Motion will be granted as to the TILA claim but denied as to Plaintiff's UTPCPL claim and his class claims. An appropriate order follows.

/s/ Gerald Austin McHugh
United States District Court Judge